UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
JOHN LACERTOSA,

                      Plaintiff,

    -against-

BLACKMAN PLUMBING SUPPLY CO., INC.,
RICHARD BLACKMAN, ISLANDWIDE
RECEIVABLES INC., MICHAEL SCHIRANO,
PAUL BEDFORD, F.D.R.P. INCORPORATED,
F.V.A. INC., CONFLICT ECONOMICS, INC.,
STEVEN SUNDACK, JON SUNDACK, and
SUNDACK C.P.A., P.C.,

                      Defendants.
----------------------------------------------------------x

**MEMORANDUM & ORDER**

10-CV-1984 (SLT) (VMS)

**TOWNES, United States District Judge:**

Defendants Blackman Plumbing Supply Co., Inc., Richard Blackman, Michael Schirano (collectively, "Blackman Defendants")[1] and Sundack C.P.A., P.C., Steven Sundack, and Jon Sundack, (collectively, "Sundack Defendants"), move separately pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss with prejudice this action brought under the civil provision of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964.[2] For the reasons set forth below, pro se Plaintiff John LaCertosa's claims are dismissed for lack of standing.

---

[1] Although Islandwide Receivables Inc. is named as a defendant in this action and counsel for Blackman Defendants has appeared on its behalf, (see Docket Nos. 20, 21, 23), that entity is not named by counsel for Blackman Defendants in their pending motion.

[2] Defendants Paul Bedford, F.D.R.P. Incorporated., F.V.A., Inc., and Conflict Economics, Inc., do not have a pending motion to dismiss. Bedford withdrew his motion to dismiss, (Docket No. 67), and instead filed an answer pro se on behalf of himself, individually, (Docket No. 82). His corporate entities remain unrepresented and have not appeared in this action.

I. **BACKGROUND**

A. **Facts**

The following facts are drawn from the 125-page second amended complaint (Docket No. 79 ("SAC")) and are assumed true for purposes of this motion to dismiss. The dates are approximate, as indicated in the pleading.

1. **Parties**

LaCertosa was at all times relevant to this action the sole shareholder of LS Home Services ("LS"), Lone Star Home Heating, Inc. ("Lone Star"), Assured Mechanical Service Corp. ("AMS"), and Heatserve Corp ("Heatserve").[3] (SAC ¶¶ 2-6). Blackman Defendants are engaged in the business of plumbing supplies and Schirano is their "credit manager." (SAC ¶¶ 7-11). Schirano recommended Bedford to LaCertosa as a "banking expert" and business advisor who had worked with other Blackman customers to grow their businesses. (SAC ¶ 12). Sundack Defendants are accountants, retained by LaCertosa after introductions from Bedford. (SAC ¶¶ 13-15).

2. **Business Relationships and Alleged Conspiracy**

LaCertosa has been engaged in the business of gas heating, service, repair, and installation for more than eighteen years. (SAC ¶ 17). In 1992, his first company, Lone Star, established a business relationship with Blackman Defendants, one of the largest American plumbing supply companies engaged in the wholesale distribution of heating equipment. (SAC ¶ 17). For about fifteen years, Lone Star was permitted to purchase supplies from Blackman Defendants on credit, and by September 30, 2006, had grown its credit line to nearly $25,000.

---

[3] As explained below, LaCertosa's corporate entities are no longer plaintiffs in this action.

(SAC ¶ 17). Having exhausted its line of credit, Lone Star was paying cash on delivery for goods from Blackman Defendants. (SAC ¶ 20).

On November 7, 2007, Schirano "caused Lone Star to hire Bedford" to help with business growth. (SAC ¶ 18). On November 8, 2007, during a phone call with LaCertosa, Bedford recommended Sundack Defendants as "the accountant member of [his] 'business growth turnaround' team for the past 20 years." (SAC ¶ 19). LaCertosa met with Sundack Defendants at his home two days later. (SAC ¶ 19). On November 16, 2007, "Bedford together with Sundack, and coordination with Schirano and Blackman . . . reorganized Lone Star" and created a new corporation, LS. (SAC ¶¶ 20, 22). At that point, Bedford instructed LaCertosa that he could no longer make payments to Blackman Defendants from the Lone Star account, (SAC ¶ 22), and "insisted" that LS establish a new line of credit with Blackman Defendants, (SAC ¶ 23). LaCertosa alleges that "[t]he establishment of LS's line of credit was an integral part of the plan" of the alleged enterprise, "to create an indebtedness by LS to Blackman [Defendants] and divert assets of LS, Lone Star, and LaCertosa to Blackman [Defendants]" for their benefit. (SAC ¶ 23). On other occasions, Bedford "counseled LaCertosa on methods of deceiving credit card issuers and banks, which Bedford called 'Creative Banking,' for the purpose of paying himself and diverting moneys to" Blackman Defendants. (SAC ¶ 24).

On September 9, 2008, Bedford "unilaterally facilitated" the incorporation of Heatsearve, through which Sundack Defendants could manage LS's payroll services. (SAC ¶ 31). Bedford also assured LaCertosa he would "resolve" approximately $550,000 in tax liabilities of AMS, another LaCertosa corporation, by hiring attorneys to sue AMS's former accountants. (SAC ¶ 32). Bedford further promised to deliver "an infusion of growth capital through a network of

3

investors." (SAC ¶ 32). According to LaCertosa, Bedford never delivered on these promises. (SAC ¶ 32).

As noted, Bedford introduced LaCertosa to Sundack Defendants, accountants who "falsely represented" they would calculate and "see to all of the required filing of tax returns." (SAC ¶ 35). Bedford and Sundack Defendants "prevailed upon LaCertosa" to give Sundack Defendants authority, by powers of attorney, to execute tax plans on behalf of Lone Star, LS, and LaCertosa. (SAC ¶ 35). Yet, Sundack Defendants never calculated, prepared, or filed taxes for Lone Star, LS, Heatserve, or LaCertosa, personally. (SAC ¶ 37). Instead, due to the "acts and omissions of Bedford and Sundack," the tax obligations of Lone Star, LS, and LaCertosa increased from approximately $636,000 at the end of 2007 to nearly $1.3 million presently. (SAC ¶ 35). As noted, Bedford and Sundack Defendants also represented that they would "eliminate" the approximately $550,000 tax liability of AMS, but the liability instead increased to more than $863,000, which became the personal liability of LaCertosa as sole shareholder. (SAC ¶ 35).

In paragraphs too numerous to cite, LaCertosa lists examples of faxes, letters, emails, and website information that purportedly evince wire, mail, and bank fraud committed by various defendants in this case. (See, e.g., SAC ¶¶ 45-61). In particular, LaCertosa alleges that Blackman Defendants regularly sent "fraudulent billing statement[s]" through the mail with "phantom recycled service charge[s]," (see, e.g., SAC ¶ 119), imposing "usurious interest rates," (SAC ¶ 120), and that on April 24, 2009, Blackman Defendants filed a "frivolous complaint" in New York State Supreme Court against LS and LaCertosa to recover $70,024.55 on the "fraudulent invoices," (SAC ¶¶ 122, 123). The complaint was ultimately dismissed. (SAC ¶ 122).

4

In this action, LaCertosa essentially claims that Bedford, Schirano, and Sundack Defendants committed deceptive acts and "exercised control" over the corporate accounts of LaCertosa and his businesses as part of a conspiracy to make assets – "previously earmarked" for taxes and employee expenses – available for payment on debts to Blackman Defendants. (SAC ¶¶ 38, 41). Having missed an opportunity for tax amnesty and due to the defendants' actions, "LaCertosa is now exposed to tax liabilities totaling" more than $3 million. (SAC ¶ 35). As a result of these debts, LaCertosa claims that he is no longer able to pay his home mortgage; his personal vehicle was ultimately repossessed; he is unable to process payroll services and is in debt to his employees for back wages; he has had to take money from his "special needs" daughter as well as his wife's salary; he is in debt to the Worker's Compensation Board; and he has defaulted on his liability insurance, which resulted in the loss of company vehicles, increased costs to rent such vehicles, and exposure to lawsuits. (SAC ¶ 32).

B.  **Procedural History**

This case has followed a rather tortured path. LaCertosa commenced the action on May 3, 2010, originally on behalf of himself, individually, and his corporations, LS, Lone Star, Heatserve, and AMS. (Docket No. 1). At that time, these plaintiffs were all represented by counsel, who thereafter filed an amended complaint. (Docket No. 38). On October 25, 2010, the Court denied their motion for default against the corporate defendants related to Bedford, with leave to refile if Bedford failed to retain counsel for these entities. (Docket No. 47). Bedford did not retain counsel and the plaintiffs again moved for default against his corporate entities. (Docket Nos. 72, 73). On September 20, 2011, the Court denied the motion, noting that the plaintiffs' papers were "plainly inadequate" and that their request for $90 million in damages and $3 million in attorneys' fees was "patently absurd." (Docket No. 74 at 3).

5

On September 23, 2011, the Court orally granted Blackman Defendants' and Sundack Defendants' first motions to dismiss, giving the plaintiffs leave to amend their complaint by November 23, 2011. After enjoying two extensions, the plaintiffs filed a second amended complaint on February 6, 2012. (Docket No. 79). The current pleading asserts four causes of action under 18 U.S.C. § 1962(a)-(d) and seeks a total of nearly $54 million in damages, attorneys' fees and costs. (SAC at 121-25).

On April 6, 2012, the Court orally granted the request of Blackman Defendants and Sundack Defendants to file their second motions to dismiss. On August 31, 2012, however, plaintiffs' counsel informed the Court that he had been terminated and requested a stay of the proceedings. (Docket No. 88). LaCertosa also filed a request for additional time to serve opposition papers, stated that he disagreed with his attorney's handling of the case, and sought permission to appear pro se in this action. (Docket No. 89). The Court stayed the proceedings and referred to Magistrate Judge Vera M. Scanlon the matter of counsel's motion to withdraw. (Docket No. 91).

At the September 24, 2012, conference, Judge Scanlon informed LaCertosa that the appointment of pro bono counsel was not likely, that any extension of time would be brief, and that "Plaintiff corporate entities must have counsel to proceed in this action." (Docket No. 95 at 4-5). Without such representation, Judge Scanlon cautioned LaCertosa that "Defendants would be entitled to move to dismiss the action and that motion would likely be granted." (Docket No. 95 at 5). On November 1, 2012, Judge Scanlon denied LaCertosa's application for pro bono representation, noting that counsel "was willing to continue the representation but-for Plaintiffs' decision to discharge him because of a disagreement as to some of the decisions made by the attorney." (Docket No. 104 at 2).

On October 24, 2012, LaCertosa informed the Court that he had been unable to obtain new counsel, but claimed: "I am able to prove that the corporate plaintiffs are not needed in this matter .... I am ready and capable of proving that the damages ... were not only done directly onto the corporate plaintiffs but, were also done directly onto me, individually, <u>as I am the sole shareholder</u> ... and any damages and liabilities proximately caused by the defendants have fallen onto me, individually." (Docket No. 98 at 2) (emphasis added). On November 20, 2012, the Court granted Blackman Defendants' request that the corporate plaintiffs be dismissed from this action, permitted Blackman Defendants and Sundack Defendants to address the issue of Plaintiff LaCertosa's standing in their replies, and allowed LaCertosa to respond to the issue of standing in a sur-reply. (Docket No. 108). These motions to dismiss are now fully briefed. (Docket Nos. 112-23).

## II. LEGAL STANDARD

In considering a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. See <u>Ruotolo v. City of New York</u>, 514 F.3d 184, 188 (2d Cir. 2008). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must allege sufficient facts "to state a claim to relief that is plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 569 (2007). While materials outside the four corners of the complaint are "generally not considered on a motion to dismiss unless the court treats it as one for summary judgment," <u>Nicholls v. Brookdale Univ. Hosp. Med. Ctr.</u>, No.

03-CV-6233 (JBW), 2004 WL 1533831, at *2 (E.D.N.Y. July 9, 2004), a court can consider "documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit," Brass v. Am. Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993). Additionally, a court "need not liberally construe [a] plaintiff's complaint" where, although he is currently proceeding pro se, "plaintiff was represented by counsel at the time [he] filed [his] complaint." de Ganay v. de Ganay, No. 11 Civ. 6490 (NRB), 2013 WL 1797993, at *2 n.4 (S.D.N.Y. Apr. 29, 2013).

As to the particular claims asserted here, courts in this Circuit have cautioned that alleged RICO violations "must be reviewed with appreciation of the extreme sanctions it provides, so that actions traditionally brought in state courts do not gain access to treble damages and attorneys fees in federal court simply because they are cast in terms of RICO violations." Leung v. Law, 387 F. Supp. 2d 105, 112-13 (E.D.N.Y. 2005); see Schmidt v. Fleet Bank, 16 F. Supp. 2d 340, 346 (S.D.N.Y. 1998), (noting that civil RICO is "the litigation equivalent of a thermonuclear device" so that "courts must always be on the lookout for the putative RICO case that is really nothing more than an ordinary fraud case clothed in the Emperor's trendy garb").

### III. DISCUSSION

#### A. Civil RICO

The civil RICO statute provides that it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. §

1962(c). To establish a civil RICO claim, a plaintiff must allege "(1) conduct, (2) of an enterprise, (3) through a pattern (4) [consisting of two or more predicate acts] of racketeering activity, as well as injury to business or property as a result of the RICO violation." Lundy v. Catholic Health Sys. of Long Island, Inc., 711 F.3d 106, 119 (2d Cir. 2013) (internal quotation marks omitted).

Moreover, to demonstrate standing for a civil RICO claim, a plaintiff must plead: "(1) the defendant's violation of § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation." Lerner v. Fleet Bank, N.A., 318 F.3d 113, 120 (2d Cir. 2003). With regard to the injury clause, the Supreme Court has "limit[ed] standing to plaintiffs whose injuries were caused proximately by the RICO predicate acts." Leung, 387 F. Supp. 2d at 113 (citing Holmes v. SEC Investor Prot. Corp., 503 U.S. 258, 268 (1992)).

### B. Standing

Blackman Defendants and Sundack Defendants argue that not only has LaCertosa failed to state a claim under the civil RICO statute, but that he does not have standing to bring this action in his individual capacity. (Blackman Reply at 3-4; Sundack Reply ¶ 11). As noted, LaCertosa alleges that the defendants, through racketeering activities, exerted control over his corporations to divert money to Blackman Defendants that should have gone to pay taxes, employee wages, and insurance. (See SAC ¶¶ 38, 41).

Although LaCertosa states in his complaint that he personally suffered injuries as a result of the alleged racketeering activities, (see SAC ¶ 32), these injuries are principally due to his liability as the sole shareholder of his corporations. It is well settled that "[a] shareholder generally does not have standing to bring an individual action under RICO to redress injuries to the corporation in which he owns stock. This is true even when the plaintiff is the sole

shareholder of the injured corporation." Manson v. Stacescu, 11 F.3d 1127, 1131 (2d Cir. 1993) (internal citations omitted); see Feinberg v. Katz, No. 99 Civ. 45, 01 Civ. 2739 (CSH), 2005 WL 2990633, at *6 (S.D.N.Y. Nov. 7, 2005) ("Manson remains controlling authority in this circuit."). Put simply, when assets of the corporation have been removed, "it is the corporation—having an independent legal identity—that must seek, on its own or derivatively, to redress its injury. The shareholder in such a case is injured only as a result of the injury to another, i.e., the corporation, and therefore generally lacks standing." Bingham v. Zolt, 66 F.3d 553, 561-62 (2d Cir. 1995).[4]

To the extent LaCertosa asserts that he has been injured because, as sole shareholder, he is personally obligated for, and unable to pay, certain debts by virtue of the defendants' actions, he nevertheless lacks standing because "[t]he alleged looting of the Company only harmed the [plaintiff] indirectly." Manson, 11 F.3d at 1130; see Infanti v. Scharpf, No. 06 Civ. 6552, 2012 WL 511568, at *4 (E.D.N.Y. Feb. 15, 2012) ("Nor does [plaintiff's] personal guarantee of the [corporation's] loans create standing to bring a civil RICO claim for losses to the corporation."). LaCertosa also argues that he has been personally harassed, intimidated, and defamed, in particular by Schirano. (Pl. Sur-reply at 9 (citing SAC ¶¶ 63, 136)). Still, the alleged threats were directed at LaCertosa "because of his positions of employment with the Company" and

---

[4] The Second Circuit has recognized a "special duty exception" to this general rule. Manson, 11 F.3d at 1131; see Ceribelli v. Elghanayan, 990 F.2d 62, 63 (2d Cir. 1993). To invoke this exception, however, a plaintiff "must allege that its injury arose from the breach of a duty that is distinguishable from the duty owed to the corporation and the other shareholders." At The Airport v. ISATA, LLC, 438 F. Supp. 2d 55, 64-65 (E.D.N.Y. 2006). For example, courts have applied the exception where a plaintiff alleges he was "fraudulently induced to become a shareholder in the first place." Lakonia Management Ltd. v. Meriwether, 106 F. Supp. 2d 540, 551 n.21(S.D.N.Y. 2000); see Department of Econ. Dev. v. Arthur Andersen & Co., 924 F. Supp. 449, 464 (S.D.N.Y. 1996) (collecting cases where individual RICO standing was based upon claims of fraudulent inducement). LaCertosa has not asserted that this exception should apply to his claims, nor has he alleged facts that would show some type of independent duty owed to him separately from his corporations.

therefore are insufficient to confer individual standing. Manson, 11 F.3d at 1132. These acts operate as part of the alleged RICO scheme directed at the corporate entities, not LaCertosa personally, so that "any injury sustained by [him] was an indirect result of the Company's injuries." Id. at 1133.

Accordingly, LaCertosa lacks standing in his individual capacity to assert the RICO claims put forth in the second amended complaint. Dismissing his action on this ground, the Court need not address the remaining arguments offered by Blackman Defendants and Sundack Defendants as to the substantive adequacy of LaCertosa's civil RICO claims.

## IV. CONCLUSION

For the reasons set forth above, Defendants' motions to dismiss (Docket Nos. 112-15, 119) are granted, as Plaintiff lacks standing to bring this action in his individual capacity. The Clerk of Court is respectfully directed to close this case.

**SO ORDERED.**

/S/ Judge Sandra L. Townes

SANDRA L. TOWNES
United States District Judge

Dated: July 12, 2013
Brooklyn, New York